1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

SAN JOSE DIVISION

7

8 | UNITED STATES OF AMERICA,

Case No.  5:19-cv-03246-EJD

Plaintiff,

9

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

10 | v.

11 | FRANCIS BURGA, et al.,

Re: Dkt. No. 34

12 | Defendants.

13        Plaintiff, United States of America ("the Government"), filed this action against

14 | Defendants Francis Burga ("Francis") and Francis Burga as the Administrator of the Estate of

15 | Margelus Burga ("Margelus") (collectively "Defendants") for their failure to report an estimated

16 | 271 foreign bank accounts to the Internal Revenue Service ("IRS") for the 2004–2009 reporting

17 | years in violation of the Bank Secrecy Act ("BSA").  First Am. Compl. ("Compl."), ECF No. 32.

18 | The Government filed a motion for partial summary judgment seeking a finding that Defendants

19 | had a financial interest in or authority over the 271 foreign bank accounts, and their failure to

20 | report the accounts was willful.  Pl.'s Mot. for Summ. J. ("MSJ"), ECF No. 34.  Defendants filed

21 | an opposition, and the Government filed a reply.  Defs.' Opp'n to MSJ ("Opp'n"), ECF No. 38;

22 | Pl.'s Reply in Support of MSJ ("Reply"), ECF No. 39.  On October 27, 2023, the Court heard oral

23 | arguments and took the matter under submission.  ECF No. 43.  For the reasons stated below, the

24 | Court **GRANTS IN PART** and **DENIES IN PART** the Government's motion for partial

25 | summary judgment.

26 | I.      **BACKGROUND**

27        The Government is seeking duplicative amounts of $52,581,604 in penalties for

28 | Case No.: 5:19-cv-03246-EJD
ORDER GRANTING IN PART AND DEN. IN PART MOT. FOR SUMM. J.

United States District Court
Northern District of California

Defendants' alleged willful failure to file Reports of Foreign Bank and Financial Accounts ("FBARs") for approximately 271 foreign bank accounts in 2004–2009.  *See* Compl. ¶ 35.

The Court will begin its discussion by providing a brief overview of Defendants' background and business, the structure of foreign accounts, entities, and foundations (the "Structure"), and Defendants' history with FBAR reporting.

### A. Margelus and Francis Burga

Margelus[1] was a Romania-born United States citizen with a background in mechanical engineering.  Answer ¶ 19.[2]  Margelus founded Marburg Technologies Inc. ("Marburg") to design and manufacture precision components and assemblies for the data storage industry.  *Id.* ¶ 20.

Francis is a Philippine-born United States citizen with a nursing degree in the Philippines and an undergraduate degree in Business Management in the United States.  *Id.* ¶ 16; Opp'n 2 (conceding undergraduate business degree).  Francis co-founded Magnebit Corporation ("Magnebit") to supply magnetic heads and test heads for computers.  Answer ¶ 18.  Francis developed customer relationships in Asia and was familiar with manufacturing functions in Singapore.  Dep. of Francis Burga ("FB") 18:15–18, 21:5–8, ECF No. 34-1.

Margelus and Francis met around 1989 through their businesses after Marburg began supplying Magnebit a computer part called a slider.  *Id.* at 11:3–9.  Margelus and Francis developed a romantic relationship around 1990.  *Id.* at 11:13–15.  In 1991 and 1993, Margelus and Francis had two children.  Answer ¶ 24.  They married in 1995.  *Id.* ¶ 25.

In early 1990, Margelus convinced Francis to work with him as part of a new company, Glide/Write USA[3] ("GWUSA"), a "d.b.a." of Marburg.  Answer ¶ 22.  Francis accepted the title of Vice President of Manufacturing and Sales.  FB 28:2–13.  Approximately two years later, Francis assumed two corporate officer positions for GWUSA: Treasurer and Secretary.  Answer ¶ 23.  Francis brought customers with her from Magnebit over to GWUSA, and by 1995, GWUSA

---

[1] Given their shared last name, the Court will refer to Defendants by their first names.
[2] All citations to Defendants' Answer indicate that Defendants concede the facts stated in the corresponding paragraph of the Government's Amended Complaint.  *See* Compl.
[3] GWUSA developed into GW Japan, GW Singapore, and GW Vietnam.  *See* MSJ 25.

1    successfully established a business presence in Asia.  Dep. of Marburg Technologies (Francis

2    Speaking as President) ("MT") 87:4–10, ECF No. 34-4.  Margelus died in January 2010, after

3    which time Francis took over all operations as President of GWUSA.  Answer ¶¶ 5, 37.

4        Francis testified that, throughout their relationship, Margelus was physically and mentally

5    abusive.  FB 133:17–134:9.  Margelus kept financial information from Francis and forbade her

6    from asking questions about the business's financials.[4]  *Id.*  Margelus often told Francis to sign

7    documents, and he became very upset if Francis asked any questions, calling her "stupid" and

8    "imbecile," and telling her that she did not need to know anything about the business's financials.

9    *Id.*  He would say these things in front of others, including colleagues and customers.  *Id.* at

10   133:17–134:9; 88:15–20.  Francis would avoid asking Margelus questions to evade this abuse, so

11   she often signed documents without reviewing them.  *Id.* at 133:17–134:9.

12       **B.    The Structure**

13       During the 2004–2009 reporting years, Margelus had caused to be created three foreign

14   foundations established in Liechtenstein, which owned at least twenty-five foreign tiered entities

15   across ten countries, which operated approximately 271 foreign bank accounts.  *See* Compl. ¶ 12;

16   Opp'n 11 (indicating that Defendants do not dispute 271 foreign accounts); App. 1–10 (including

17   Structure charts created by Defendants' financial advisor, Peter Meier, listing foundations and

18   entities); MSJ App. C, ECF No. 34-26 (list of foreign accounts).  The Government refers to this as

19   the "Structure."  MSJ 1.  The 271 foreign bank accounts are listed in the Government's Appendix

20   C, but in the interest of brevity, the Court will provide a big picture overview of the relevant

21   accounts and entities.

22       **1.    UBS Accounts**

23       In October 1993, Defendants opened a joint bank account—the first foreign account at

24   issue—with the Swiss Bank Corporation (now called Union Bank of Switzerland ("UBS")).  App.

25   125–65.  Both Margelus and Francis appeared at UBS in person and signed the account

26

27   _____

     [4] Defendants do not define "financials."

28

documents.  *Id.*  The account was a "numbered account," meaning it was maintained in secrecy under the pseudonym "Rubag."  App. 126, 148.  Six sub-accounts were later created under the joint primary account.  *Id.* at 151, 3907–79.

Francis concedes that she had a financial interest in the primary account, but she contests that she had an interest in or authority over the sub-accounts.  Opp'n 16.  Further, apart from the first UBS account she opened with Margelus in 1993, Francis testified that she did not know the rest of the Structure existed until after Margelus's death in 2010.  FB 123:15–17; *see also* Dep. of Peter Meier ("PM") 46:8–11, ECF No. 34-3.

### 2.   Aljohn

Margelus began creating the Structure's tiered entities in 1995 by establishing Aljohn Establishment ("Aljohn") with the help of Peter Meier ("Mr. Meier"), financial advisor at the Liechtenstein Global Trust.  PM 17:21–18:7; 69:19–20.

In May 1995, Margelus and Francis met Mr. Meier in Liechtenstein.  Answer ¶ 29. Francis only briefly met Mr. Meier but did not participate in the substantive meeting between him and Margelus.  FB 41:4–11; PM 24:12–25:1.  At this meeting, Margelus asked Mr. Meier to set up a company in Liechtenstein to organize GW Asia sales outside of the United States.  App. 3632; PM 17:21–18:7.  Margelus indicated to Mr. Meier that it was important for Margelus to build and protect a fortune outside the United States.  PM 438–13.  Upon Margelus's instruction, Mr. Meir set up a Liechtenstein entity called Aljohn.  *Id.* at 69:6–70:1, 124:2–5.  Aljohn's sole purpose was to receive commission from a Liechtenstein entity called Ingenieurburo Koch Anstalt ("IKA"), which was owned by Liechtenstein resident, Andrea Koch.  *Id.* at 124:2–5, 125:25–126:9, 145:7–13, 436:25–437:12.  Mr. Meier introduced Margelus to Mr. Koch.  *Id.*  They set up an arrangement whereby IKA would receive cash from GW Japan and GW Singapore sales and forward a portion of the cash to Aljohn and another portion to GWUSA.  *Id.* at 145:18–21, 147:22–148:11, 239:14–19; App. 625–41; Opp'n 7.

### 3.   Romphil Foundation

In 1996 Margelus worked with Mr. Meier to create the Romphil Foundation, a

United States District Court
Northern District of California

Liechtenstein *stiftung* (a foundation closely resembling a United States trust, App. 18, 50) to hold Aljohn and other assets.  PM 33:2–5, 133:23–134:5.  The 2004 bylaws designated Margelus as the sole primary beneficiary for life, and Francis and their two children as second beneficiaries after the death of the primary beneficiary.  App. 2005.  Margelus appointed himself as Romphil's protector and designated Francis as his successor.  App. 2008–09. The Romphil Foundation ultimately went on to create the remaining entities and hold the entire Structure until 2007.  PM 33:2–5, 12–13, 133:23–134:5; *see, e.g.,* App. B.1–B.6.

### 4.    Bakewell Assets

In 1998, the Structure purchased Bakewell Assets, a British Virgin Islands shelf company. PM 267:8–17.  Margelus, Francis, and Mr. Meier were all directors of Bakewell.  PM 383:1–11. As directors, Margelus, Francis, and Mr. Meier collectively signed a 1998 resolution authorizing Bakewell to open a bank account with LGT and to purchase a property in Hawaii.  FB 81:9–14, 82:19–22, 84:3–4, 120:12–19; PM 292:3–16; App. 2199–212, 3640.  Bakewell is listed as the owner of three foreign accounts at the LGT bank: LGT x6.023, LGT x6.030, and LGT x7216. App. 2020–24.  Bakewell was also used to pay boarding school tuition for Francis and Margelus's children.  *Id.* at 2221–45; 3646.

### 5.    Micadema Foundation

After the IRS began its investigation into the Structure in 2007, Margelus transferred the UBS accounts to a new *stiftung*, Micadema.  App. 166–69; PM 108:10–13, 321:12–19, 322:11–15, 323:22–25.  Micadema was created, and the accounts were transferred, on August 7, 2007, the same day that the IRS interviewed Margelus.  *Id.*

### 6.    Marfran Foundation

Following the initiation of the IRS investigation, the Structure continued to change.  *See, e.g.,* App. B.1–B.  Amidst these changes, between 2007–2008, all assets in the Romphil Foundation were transferred to Marfran, another *stiftung* in the Structure.  App. 2623, 2586–91. The Government alleges that the Structure still exists today.  MSJ 34.

1

### 7.     The Structure's Benefits

The proceeds from the Structure were used to purchase for Defendants a multi-million dollar home in Saratoga, CA, Hawaiian real estate, their children's private boarding school tuition, an Italian vineyard, a luxury tile business, a Swiss investment company, loans, and more.  PM 75:20–76:14, 84:7–9, 161:12–19, 222:9–223:5, 278:1–11; 313:1–22, 341:24–342:17, 353:3–5, 353:22–354:9, 358:20–359:6, 467:9–19; FB 129:16–130; App. 2116–29, 2221–45, 3646.  The Government alleges that the Structure was ultimately used to divert and shelter at least $17 million of GWUSA profits through a false invoicing scheme.  MSJ 1.

### A.     FBARs

Neither Margelus nor Francis filed FBARs for the 2004–2008 reporting years.  Margelus and Francis's tax preparer for these years, Marburg CFO B.G. Ebrahimi ("Mr. Ebrahimi"), testified that he asked Margelus and Francis each year whether they had any foreign accounts, and each year they said no.  Dep. of B.G. Ebrahimi ("BG") 28:22–30:19, 74:8–21, 89:21–90:17, 218:9–12, ECF No. 34-6.  In 2009, Mr. Ebrahimi asked whether they had foreign accounts in an email to both Margelus and Francis, but Margelus replied without copying Francis and said that he did not have any foreign bank accounts.  BG 36:7–16; App. 2879.  However, Francis testified that she was never involved in the preparation of their taxes.  FB 141:18–142:9.  Mr. Ebrahimi also testified that he reviewed the forms with Margelus and Francis each year, but Francis testified that she never reviewed the forms.  BG 31:2–16; FB 141:18–142:9.  Both Margelus and Francis signed the tax form each year indicating that they did not have foreign accounts, but Francis testified that she signed the documents without reading them to avoid Margelus's abuse.  FB 137:15–138:4.

Margelus passed away in January 2010, after which time Francis testified that she was made aware of the Structure by opening IRS letters addressed to Margelus.  FB 62:18–25.  Francis hired legal representation and filed the first FBAR on behalf of the Estate in 2010 for the 2009 reporting year.  *Id.* at 61:19–23; App. 3037.  However, Francis only reported 85 foreign accounts, leaving approximately 62 foreign accounts unreported.  App. 3037.  Francis did not file an FBAR on her personal joint tax return for the 2009 reporting year, which was also filed after Francis

United States District Court
Northern District of California

became aware of the Structure.

## II.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment only when the moving party shows that there is no genuine dispute of material fact.  A genuine dispute exists if there is sufficient evidence that a reasonable fact finder could decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And that dispute is material if it might affect the outcome of the suit.  *Id.*  In determining if a genuine dispute of material fact exists, a court must "tak[e] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party."  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party bears the burden of persuading the Court that there is no genuine dispute of material fact, and it also bears the initial burden of producing evidence that demonstrates there is no dispute.  *Cunningham v. Medtronic, Inc.*, 2018 WL 4053446, at *2 (N.D. Cal. Aug. 24, 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  When the moving party bears the ultimate burden of persuasion, its initial burden of production is to "establish 'beyond controversy every essential element of'" its claim or defense.  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citation omitted).  If the moving party satisfies this initial burden, the nonmoving party can nonetheless defeat summary judgment by showing "the evidence, taken as a whole, could lead a rational trier of fact to find in its favor."  *Id.*

## III.     DISCUSSION

Under the Bank Secrecy Act ("BSA"), residents and citizens of the United States are required to submit FBARs to the Commissioner of the IRS disclosing certain relationships with foreign financial agencies.  31 U.S.C. § 5314(a); 31 C.F.R. § 1010.350.  One covered relationship includes "having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country."  31 C.F.R. § 1010.350(a).

Liability under the BSA for failing to submit an FBAR arises when four elements are met: (1) the defendant is a United States citizen or lawful permanent resident, (2) the defendant has a

Case No.: 5:19-cv-03246-EJD
ORDER GRANTING IN PART AND DEN. IN PART MOT. FOR SUMM. J.

United States District Court
Northern District of California

financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country, (3) the total balance in the account exceeds $10,000, and (4) the defendant willfully failed to disclose the account. *See id.*

Defendants concede that they are United States citizens and the total balance in all accounts exceeded $10,000. Defendants further concede that Margelus had a financial interest in all accounts and Francis had a financial interest in one UBS account, but not the remaining accounts. Defendants argue that neither Francis nor Margelus willfully failed to file the FBARs. That leaves two overarching questions for the Court to decide on this motion:

(1) Are there genuine disputes of material fact that Francis had a financial interest, signature authority, or other authority over the Structure's 271 foreign bank accounts during the reporting years 2004–2009?

(2) Are there genuine disputes of material fact that Margelus and Francis acted willfully in failing to file FBARs for the reporting years 2004–2009?[5]

**A.      Financial Interest, Signature Authority, or Other Authority**

Defendants concede that Margelus had a financial interest in all the accounts at issue. Opp'n 16. The only issue remaining is whether Francis had a financial interest, signature authority, or other authority in the accounts at issue during the 2004–2009 reporting years.

The parties concede that the terms "financial interest," "signature authority," or "other authority" were not defined in the FBAR statute or the applicable regulations during the reporting years at issue. *See* MSJ 23–24; Opp'n 15. However, the parties reference the definitions from the FBAR instructions during the relevant filing years, and the Treasury issued regulations largely consistent with these FBAR instructions in 2011. *See id.*; 31 C.F.R. § 1010.350(e).

The FBAR instructions defined having a "financial interest" as being either (1) the owner of record or (2) the holder of legal title or an account for which the owner of record or holder of

---

[5] As an initial matter, Defendants object as to the use of the IRS's interview of Margelus on August 7, 2007, as hearsay. Opp'n 9. The Court did not rely on this document in its Order here, therefore the Court will not address Defendants' evidentiary objection at this time.

1   legal title is: (a) an agent or nominee or someone acting on behalf of the person, (b) a corporation

2   that the person owns more than 50 percent of (directly or indirectly), or (c) a trust that the person

3   has a beneficial interest in more than 50 percent of the assets.  App. 3040.

4        The instructions defined "signature authority" as being able to "control the disposition of

5   money or other property in it by delivery of a document containing his or her signature (or his or

6   her signature and that of one or more other persons) to the bank or other person with whom the

7   account is maintained."  *Id.*

8        The instructions defined "other authority" as being able to "exercise comparable power

9   over an account by direct communication to the bank or other person with whom the account is

10  maintained, either orally or by some other means."  *Id.*

11       While there is limited case law analyzing financial interest, signature authority, and other

12  authority in this context, the Court finds some cases instructive.  For example, in *United States v.*

13  *Clines*, 958 F.2d 578, 583 (4th Cir. 1992), the Fourth Circuit found "other authority" where the

14  defendant had complete control over the corporation owning the bank account—while the

15  defendant was not listed as the owner of the account, the funds were at his disposal whenever he

16  wanted, and the currency was transferred directly to him at his direction.  *Id.*  Similarly, in *United*

17  *States v. McBride*, 908 F. Supp. 2d 1186, 1203 (D. Utah 2012), the District of Utah court found

18  authority and financial interest where the defendant maintained a deliberately disguised ownership

19  structure in which he could direct his corporation to place its profits in the offshore accounts.  *See*

20  *also, e.g., United States v. Markus*, No. CV 16 2133, 2018 WL 3435068, at *5 (D.N.J. July 17,

21  2018) (noting that "[c]ourts have repeatedly found that 'other authority' exists where a foreign

22  account is held by someone who acts on behalf of another, or an entity that is indirectly controlled

23  by a U.S. person" and finding that the defendant had other authority where he solicited payments

24  to the account for his own purposes through his father and brother).

25       The Court sees two categories of accounts in the Government's arguments that Francis had

26  a financial interest in or authority over the foreign bank accounts in the Structure.  First, there are

27  the accounts where the Government supports its arguments with undisputed documentary evidence

28

from the banks, i.e., the UBS accounts, Raiffeisen x50.17, GKB x0.100, and LGT accounts opened by Bakewell Asset.  Second, there are accounts where there is no documentary evidence, and the Government relies on disputed circumstantial evidence to show "other authority."  The Court will parse out each below.

### 1.   UBS Accounts

The Government argues that Francis had a financial interest in seven total UBS accounts because she opened the primary account, x7.405, from which six sub-accounts were created.  MSJ 25.  Defendants concede that Francis had a financial interest in the UBS primary account x7.405 from 2004–2007, but Defendants contest that Francis had a financial interest, signature authority, or other authority in any of the six UBS sub-accounts, or in the primary UBS account after it was transferred to Micadema after 2007.  Opp'n 16.  The Court will separately analyze the UBS accounts from 2004–2007, and the UBS accounts after 2007.

### a.   UBS Primary Account and Sub-accounts

The Government has provided UBS bank documents showing Francis's signature on the primary account UBS x7.405, App. 125–65, and bank statements listing the sub-accounts UBS x405, x280.0, x280.1, x280.3, x280.4, x280.5 on the same documents as the primary account, App. 151, 3907–79.  Defendants' sole argument in response to this evidence is that "the documents offered do not support this claim."  Opp'n 16.  Defendants did not expand on this argument during the hearing.

The Court finds that there is no genuine dispute of material fact that Francis had a financial interest in both the primary account UBS x7.405 and the sub-accounts UBS x405, x280.0, x280.1, x280.3, x280.4, x280.5 from 2004–2007.  The Government has presented UBS bank statements listing the sub-accounts under the primary account in which Francis concedes financial interest. App. 125–65, 151, 3907–79.  This evidence supports a finding that UBS considered the owner of record for the primary account to also be the owner of record for the sub-accounts.  Under the FBAR instructions at that time, being the owner of record for the sub-accounts at UBS gives Francis a financial interest in those accounts.  *See* App. 3040.  Beyond vaguely claiming that the

United States District Court
Northern District of California

1    documents do not support the Government's conclusion, Defendants have not offered any

2    evidence to create a genuine dispute of this material fact.

3                              **b.  UBS Accounts after the 2007 Transfer to Micadema**

4              After Margelus was interviewed by the IRS in 2007, Margelus transferred all funds out of

5    the UBS accounts and into Micadema.  PM 108:10–13, 321:12–19, 322:11–15, 323:22–25,

6    405:21–406:18; App. 166–69.  The Government offers one argument as to why Francis retained

7    financial interest in UBS account x7.405 after it was transferred to Micadema after 2007: "[W]hen

8    the funds held in UBS x7405 were transferred to Micadema in 2007, Francis' one-half interest in

9    these funds did not magically disappear; Micadema became the nominee for the Burgas even

10   though Margelus initiated the transaction."  MSJ 25.  Defendants respond that the Government has

11   offered no evidence that Francis was listed on the Micadema documents or considered the owner

12   of these accounts by the bank.  Opp'n 16.  Further, Defendants highlight that the Government does

13   not offer any evidence that Micadema was the nominee for Francis.  *Id.* at 16–17.

14             The Court finds that there are genuine disputes of material fact regarding whether Francis

15   retained her financial interest in the UBS accounts after they were transferred to Micadema in

16   2007.  The Government offers no evidence to support its argument that Francis's financial interest

17   in these funds remained after the transfer and summarily states that Micadema was the nominee

18   for the Burgas without defining nominee.  *See United States v. Quiel*, No. CV-21-00094, 2023 WL

19   4351543, at *6–7 (D. Ariz. July 5, 2023) (finding no financial interest where the government

20   argued nominee theory without defining nominee, among additional factual disputes).

21                              **2.       Raiffeisen x50.17**

22             The Government argues that Francis had signature authority over Raiffeisen x50.17,

23   another foreign account under the Structure.  MSJ 25.  In support of its argument that Francis

24   could control the disposition of money with her signature, the Government provided Raiffeisen

25   bank documents showing Francis's signature on a 10,000 EUR withdrawal from this account in

26   December 2009.  App. 3821–24.  Defendants rebut that the Government's evidence is insufficient

27   because they did not provide a signature card from the bank.  Opp'n 25.  Defendants also argue

28   Case No.: 5:19-cv-03246-EJD
     ORDER GRANTING IN PART AND DEN. IN PART MOT. FOR SUMM. J.

United States District Court
Northern District of California

1    that Francis believed that Raiffeisen x50.1 belonged to Margelus, and she believed that she was

2    only added to the account after Margelus died.  *Id.*

3         The Court finds that there are no genuine disputes of material fact regarding whether

4    Francis had signature authority over Raiffeisen x50.17.  The ability to withdraw money from an

5    account using your signature is the quintessential definition of signature authority.  The Court

6    rejects Defendants' argument that the Government is required to also present a signature card from

7    the bank to show signature authority.  The undisputed bank document showing Francis withdrew

8    10,000 EUR is enough to establish that Francis had the authority to make withdrawals from this

9    account.  The Court also finds irrelevant Defendants' argument that Francis did not think her name

10   was on the account.  This contention does not create a genuine dispute over the fact that she did, in

11   fact, have the authority to withdraw funds using her own name in 2009.

12                    **3.      GKB x0.100**

13        The Government argues that Francis had signature authority over GKB x0.100, another

14   foreign account under the Structure.  MSJ 25.  In support of its argument that Francis could

15   control the disposition of money with her signature, the Government provided a bank document

16   showing Francis's name on a 2009 signature card for this account.  App. 3894–95.  Defendants

17   counter that the Government has not presented evidence that she conducted any transactions with

18   this account.  Opp'n 26.  Defendants also suggest that this is not Francis's real signature in their

19   opposition.  *Id.*

20        The Court finds that there are no genuine disputes of material facts regarding whether

21   Francis had signature authority over GKB x0.100.  The signature card supports a finding that

22   Francis would have been able to transact with the bank using her signature.  The Court rejects

23   Defendants' argument that the Government is also required to present evidence of transactions to

24   meet their burden.  Further, while Defendants suggest that the signature may not belong to

25   Francis, Defendants do not argue, or provide evidence to support to argument, that this is in fact

26   not Francis's signature; instead, they merely highlight that Francis has not *affirmatively* testified

27   that it is in fact her signature.  Opp'n 17.  This is not evidence that creates a genuine dispute of

28   

United States District Court
Northern District of California

material fact.

### 4.    LGT Accounts Opened by Bakewell Assets

The Government argues that Francis had a financial interest or signature authority over three foreign LGT accounts opened by Bakewell Assets: LGT x6.023, LGT x6.030, and LGT x7216.  MSJ 25; App. 2020–24.  In support of its argument that Francis could control the disposition of money with her signature, the Government presents a 1998 resolution Francis signed as director authorizing Bakewell to open a bank account with LGT and to purchase a property in Hawaii.  FB 81:9–14, 82:19–22, 84:3–4, 120:12–19; PM 292:3–16; App. 2199–212, 3640.  The Government also presents another resolution signed by Francis and the other directors authorizing the sale of that property and wiring the proceeds to LGT x16AA (later classified as x6.023).  App. 2212.  Defendants argue that Francis had no interest in or authority over Bakewell-owned accounts because, "[a]lthough she signed a Bakewell resolution permitting Mr. Meier to open an account at LGT[,] she had no recollection of this and no involvement with this account."  Opp'n 11.

The Court finds that there are no genuine disputes of material facts regarding whether Francis had signature authority over the LGT accounts opened by Bakewell.  The resolutions show that Francis used her signature as a director of Bakewell to authorize the creation of bank accounts and wire proceeds from a property sale.  Francis's memory of this account or her involvement with it does not change the undisputed fact that, by signing a resolution to open the foreign bank account and authorizing the deposit of proceeds from the Hawaiian property sale, Francis did in fact control the disposition of money or other property with her signature.

### 5.    Remaining Accounts in the Structure

Francis's financial interest, signature authority, or other authority in the remaining accounts is not as apparent.  As Defendants highlight, Francis was not considered the beneficial owner of the remaining accounts by the relevant banks and there are no documents showing her as having an interest in the accounts.  Opp'n 24.  Thus, the Government's arguments rest on the theory that Francis's role in GWUSA provided her with "other authority" over the remaining

1    accounts.[6]  Reply 4–5.  To have "other authority," under the FBAR form definition, Francis had to

2    be able "exercise comparable power over an account by direct communication to the bank or other

3    person with whom the account is maintained, either orally or by some other means."  App. 3040.

4           The Government essentially argues that Francis "exerted significant, indirect authority"

5    over accounts in the Structure that related to GWUSA's business entities, including GW Japan,

6    GW Singapore, and GW Vietnam, because of her role as Vice President of Marketing and Sales at

7    GWUSA.  MSJ 25.  The Government has provided evidence that as Vice President of Marketing

8    and Sales, Francis negotiated sales, set pricing, mandated payment terms on correspondences, and

9    directed customers to send purchase orders to GW Japan or GW Singapore rather than GWUSA.

10   MSJ 4.  The Government argues that these duties show that she had authority over the foreign

11   bank accounts related to the entities where she sent purchase orders.  Reply 4–5.

12          Defendants argue that the Government has failed to produce evidence sufficient to show

13   indirect authority over the accounts.  Opp'n 17.  While Defendants do not contest the fact that

14   Francis played a significant role in the sales and marketing division, Francis has testified

15   repeatedly throughout her deposition that she was not involved whatsoever in GWUSA's financial

16   matters.  *See, e.g.,* MT 48:6–12; 96:14–19; 143:3–5; 214:10–215:5.  Further, Francis testified that

17   she was unable to exert any authority over the company's finances because of Margelus's abuse

18   and control over all finances.  FB 88:15–20; 133:17–134:9.

19          The Court finds it instructive to review a similar set of circumstances in *McBride*.  There,

20   the court in the District of Utah found "other authority" where the defendant maintained a

21   deliberately disguised ownership structure in which he could direct his corporation to place its

22   profits in the offshore accounts.  *McBride*, 908 F. Supp. 2d at 1203.  The court found that the

23   defendant exercised substantial control over the accounts by communicating with the

24   corporation's employees and instructing them on how to transfer funds specifically to the foreign

25

26   ───────────────

27   [6] The Government's MSJ groups Defendants together as "the Burgas" in its financial interest
     arguments, so the Court cannot discern which arguments related to which Defendant.  The Court
     pulls the Government's arguments specific to Francis from its Reply and oral arguments.

28   Case No.: 5:19-cv-03246-EJD
     ORDER GRANTING IN PART AND DEN. IN PART MOT. FOR SUMM. J.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  bank.  *Id.*  The corporation initiated bank transfers at request of the defendant, and none of his

2  requests to transfer were denied.  *Id.*  The corporation treated the accounts as the defendant's

3  accounts and the defendant had the expectation of enjoying the benefit of the assets.  *Id.*

4      The facts here are distinguishable.  There is no evidence that Francis herself maintained the

5  deliberately disguised ownership Structure, instructed the corporation's employees to transfer

6  funds to a foreign bank, initiated transfers to and from the banks, or expressed the expectation of

7  being able to transact with the banks.  While Francis admittedly had contact with the Structure's

8  invoicing scheme by sending purchase orders to GW Asia, which then sent cash to IKA and then

9  back to GWUSA, her role could conceivably have stopped there.  Based on her testimony, Francis

10  had no role in the banking operations behind the scenes, and this conclusion is supported by

11  Francis's testimony that Margelus alone controlled the business and family finances and prevented

12  Francis's involvement because of physical and mental abuse.  A trier of fact could conceivably

13  find that Francis's role in GWUSA was removed enough from the financial aspect of the company

14  whereby Francis had no authority over the remaining bank accounts in the Structure.

15      Given the genuine disputes of material fact regarding Francis's authority over the Structure

16  as a Vice President at GWUSA, the Court finds summary judgment regarding the remaining

17  accounts inappropriate at this time.[7]

18                                          \* \* \*

19      The Court finds that there are no genuine disputes of material fact regarding whether

20  Francis had a financial interest, signature authority, or other authority over UBS accounts x7.405,

21  x405, x280.0, x280.1, x280.3, x280.4, and x280.5 (from 2004 until the 2007 transfer), Raiffeisen

22  x50.17, GKB x0.100, and LGT x6.023, LGT x6.030, and LGT x7216.  However, there remain

23  genuine disputes of material fact regarding whether Francis had a financial interest, signature

24  authority, or other authority in the remaining accounts in the Structure.

25  _____

26  [7] The Government also argues that Francis had financial interest in all the accounts under a
California community property theory because she was married to Margelus.  MSJ 26.  There
27  is no legal support for this theory in the FBAR context and the Government did not elaborate at oral
arguments, so the Court declines to grant the Government's motion on this ground.

28  Case No.: 5:19-cv-03246-EJD
ORDER GRANTING IN PART AND DEN. IN PART MOT. FOR SUMM. J.

1

**B.    Willfulness**

2          Section 5321(a)(5) does not define willfulness.  The Ninth Circuit and the Supreme Court

3   also have not defined willfulness for the purposes of this statute.  However, "courts adjudicating

4   civil matters have held that an individual is willful where he/she exhibits a reckless disregard of a

5   statutory duty."  *Jones v. United States*, No. SACV1900173JVSRAO, 2020 WL 4390390, at *6

6   (C.D. Cal. May 11, 2020) (quoting *United States v. Bussell*, 2015 WL 9957826, at *5 (C.D. Cal.

7   Dec. 8, 2015) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)).

8          The Third, Fourth, Eleventh, and Federal Circuits have applied an objective reckless

9   standard to willful FBAR violation cases.  *See, e.g., United States v. Horowitz*, 978 F.3d 80, 88

10  (4th Cir. 2020) ("[W]e conclude that, for the purpose of applying § 5321(a)(5)'s civil penalty, a

11  'willful violation' of the FBAR reporting requirement includes both knowing and reckless

12  violations . . . . "); *Norman v. United States*, 942 F.3d 1111, 1115 (Fed. Cir. 2019) (determining

13  that willfulness in the context of § 5321(a)(5)(C) includes recklessness); *Bedrosian v. United*

14  *States*, 912 F.3d 144, 152 (3d Cir. 2018) (agreeing that willfulness in this context is met by

15  knowingly or recklessly failing to file an FBAR); *United States v. Rum*, 995 F.3d 882, 889 (11th

16  Cir. 2021) ("[W]e hold that willfulness in § 5321 includes reckless disregard of a known or

17  obvious risk. In so doing, we join with every other circuit court that has interpreted this

18  provision.").  District courts in the Ninth Circuit have also largely applied an objective

19  recklessness standard.  *See, e.g., Kurotaki v. United States,* No. CV 22-00063 JMS-WRP, 2023

20  WL 6604892, at *4 (D. Haw. Oct. 10, 2023); *United States v. Goldsmith*, 541 F. Supp. 3d 1058,

21  1083 (S.D. Cal. 2021); *United States v. Cohen*, 2019 WL 8231039, at *7 (C.D. Cal. Dec. 16,

22  2019); *United States v. de Forrest*, 463 F. Supp. 3d 1150, 1157 (D. Nev. 2020).[8]

23         The Third and Fourth Circuits analyze objective recklessness in the FBAR context by

24  considering whether the taxpayer "(1) clearly ought to have known that (2) there was a grave risk

25  _____

26  [8] Defendants urge the Court to adopt a subjective standard requiring willful intent, arguing that the
    standard should be stricter considering the substantial fine here.  Opp'n 19.  Considering the
27  guidance from other circuits and district courts within the Ninth Circuit, the Court declines
    Defendants' invitation and will adopt the objective recklessness standard.

28  Case No.: 5:19-cv-03246-EJD
    ORDER GRANTING IN PART AND DEN. IN PART MOT. FOR SUMM. J.

that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily." *Horowitz*, 978 F.3d at 89 (quoting *Bedrosian*, 912 F.3d at 153 (cleaned up)).

Courts have also held that "[w]illfulness may [] be proven 'through inference from conduct meant to conceal or mislead sources of income or other financial information.'" *Id.* (quoting *United States v. Williams*, 489 F. App'x 655, 658 (4th Cir. 2012)). However, courts are split as to whether signing a tax form puts a person on constructive notice of the FBAR requirements such that the failure to comply is evidence of willfulness. *Compare, e.g., Williams*, 489 F. App'x at 659 (holding that signing a tax form is prima facie evidence that the taxpayer had constructive knowledge of the FBAR requirements); *United States v. Bohanec*, 263 F. Supp. 3d 881, 890 (C.D. Cal. 2016) (same); *with United States v. Flume*, 2018 WL 4378161, at *7 (S.D. Tex. Aug. 22, 2018) (declining to follow the holdings in *Williams*); *United States v. Schwarzbaum*, 2020 WL 1316232, at *7 (S.D. Fla. Mar. 20, 2020) (same).

There is limited case law in the Ninth Circuit analyzing willfulness in this context, but the Court finds a few opinions instructive. In *United States v. Cohen*, No. CV 17-1652-MWF (JCX), 2019 WL 8231039, at *7 (C.D. Cal. Dec. 16, 2019), the court found genuine disputes of material fact regarding willfulness. The government identified "substantial conduct" demonstrating willfulness, including the defendant signing various paperwork setting up the foreign account, signing multiple tax forms referencing FBAR requirements, being told by her attorney about the FBAR requirements, and being able to have easily asked her husband, accountant, or attorney about FBAR requirements. *Id.*, at *7. The defendant identified genuine disputes of material fact, including that she did not know the bank account was foreign, she did not know how much money was in the accounts, and she disputed the fact that her attorney told her of the requirements. *Id.* The court found that these disputes precluded it from finding willfulness "as a matter of law." *Id.*

In *United States v. Katholos*, No. 17CV531JLSHKS, 2022 WL 3328223, at *8 (W.D.N.Y. Aug. 10, 2022), the district court in the Western District of New York also found genuine disputes of material fact regarding willfulness. The government offered evidence that the defendant failed to communicate with her accountant about her foreign accounts, failed to review the returns

prepared for her, and concealed her foreign accounts by using numbered USB accounts, keeping all mail from the accounts at UBS, and not identifying herself as a United States citizen at UBS. *Id.* The defendant identified genuine disputes of material fact, including that the materiality of the failure to communicate with her accountant would depend on a credibility determination of the accountant's testimony, the use of numbered accounts and holding mail cannot be viewed in a vacuum, and the defendant used her United States passport to open the UBS accounts. *Id.* The court found that these disputes precluded it from finding willfulness as a matter of law, stating: "A jury could . . . conclude that Katholos's conduct reveals willful blindness, or establishes a pattern of conduct so unreasonable as to constitute reckless disregard. Still, . . . a reasonable jury could conclude otherwise. And that is enough to make summary judgment on the issue of willfulness inappropriate." *Id.* (cleaned up) (quotations omitted) (quoting *Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 264 (2d Cir. 2005)).

### 1. Margelus

The Court finds that there are no genuine disputes of material fact as to whether Margelus willfully failed to comply with the FBAR filing requirement.

#### *2004–2008*

Defendants concede the following facts. Margelus alone managed the family's financial affairs as well as the business affairs of Marburg, with the assistance of Mr. Ebrahimi. Opp'n 5. Margelus, along with Francis, opened the first foreign account at issue in 1993 at UBS. *Id.* at 26. Margelus told Francis that he needed to open the account for consulting work and needed Francis as a co-signer. *Id.* at 6. Approximately two years later, Margelus met with Mr. Meier in Liechtenstein and set up Aljohn to hold profits for GWUSA. *Id.* at 6–7. Margelus set up the agreement with IKA whereby IKA received funds from GW Asia sales and remitted a portion of those funds to GWUSA and a portion to Aljohn. *Id.* at 7. Margelus had advised Francis and others at GWUSA, including Mr. Ebrahimi, that IKA was acting as a middleman or sales representative for GWUSA. *Id.* Margelus and Mr. Ebrahimi handled GWUSA's finances and accounting and handled tracking or accounting for transactions with IKA. *Id.* In 1996, Margelus

United States District Court
Northern District of California

created Romphil to hold Aljohn and other assets. *Id.* In 2007, Margelus created Micadema, which held other bank accounts in the Structure. *Id.* at 8. Mr. Meier provided the balance sheets and profit and loss statements from the foreign foundations to Margelus. *Id.* at 9. Mr. Ebrahimi testified that he prepared the 2004 to 2008 tax returns and verbally asked Margelus the question about foreign accounts each year. *Id.* at 12. Mr. Ebrahimi received a "no" response each year, which caused him to answer "no" on the Schedule B question about foreign accounts each year. *Id.* In 2009, regarding the tax return for the 2008 year prior, Mr. Ebrahimi asked Margelus about foreign accounts in email, to which Margelus angrily responded that he did not. *Id.* at 13. Mr. Ebrahimi testified that each year, Margelus would review the completed returns before they were submitted and would sign them. *Id.* Margelus remained in control of GWUSA and was making business decisions up until his death. *Id.* at 9.

The Government argues that Margelus was not only the beneficial owner of the Structure, but that he was in complete control. MSJ 8–9. Margelus instructed Mr. Meir to create the foundations and entities, actively managed and held control over the Structure, and consistently reviewed financial statements from the entities. Yet, the Government highlights that the undisputed evidence shows that Margelus denied having foreign accounts to Mr. Ebrahimi and reviewed the tax forms indicating that he did not have foreign bank accounts prior to signing and filing them each year. BG 28:22–30:19, 36:7–16; 74:8–21, 89:21–90:17; App. 2879. The Government also argues that the Court can infer willfulness through Margelus's conduct of trying to conceal forms of income through this intricate Structure of foreign foundations, entities, and bank accounts. MSJ 29. Taken together, the Government argues that these facts show not only objective recklessness, but an intentional willful failure to file FBARs. *Id.* at 32.

Defendants argue that there are genuine disputes of material fact under two theories. First, Defendants argue that Margelus had been advised by Mr. Meier that under Liechtenstein law he had no legal rights to the Foundation assets, therefore he "could have in good faith believed that he did not have a financial interest in the bulk of the accounts at issue which would create a factual issue as to his recklessness as to those accounts." Opp'n 23. Second, Defendants argue that there

is a factual dispute as to whether Mr. Ebrahimi asked Margelus about foreign accounts in each of the years at issue.  *Id.* at 23–24.

The Court finds that Defendants' arguments do not create a genuine dispute of material fact.  Under the Third and Fourth Circuits' test, the undisputed facts show that Margelus objectively ought to have known, or even subjectively did know, that there was a grave risk that FBARs were not being filed and was able to find out for certain very easily.

First, Margelus ought to have known about the FBAR requirements.  He personally authorized and controlled 271 foreign accounts.  Each year, he was asked whether he had foreign accounts.  A reasonable person in the same or similar circumstances—with a known financial interest in  271 foreign accounts who is asked each year while preparing his taxes whether he has foreign accounts—ought to have made the connection that he was required to report these accounts on his taxes.  While Defendants claim that there is a factual dispute as to whether Mr. Ebrahimi asked Margelus about foreign accounts each year, Defendants have not provided any evidence to rebut Mr. Ebrahimi's testimony (unlike with Francis below).  Defendants also highlight that Mr. Ebrahimi himself did not know about FBAR requirements until 2008.  *Id.* However, this does not change the fact that Mr. Ebrahimi still asked Margelus each year about the foreign bank accounts based on the questions prompted by TurboTax rather than his own knowledge of the requirements.  BG 218:9–12.

Second, there is no dispute that Margelus ought to have known that there was a grave risk that the filing requirements were not being met.  When Margelus told Mr. Ebrahimi that he did not have any foreign bank accounts, and reviewed and signed the tax forms indicating that he did not have foreign bank accounts, Margelus should have known that there was a grave risk, indeed certainty, that the filing requirements were not being met.  The Court is unpersuaded by Defendants' argument that Margelus could have in good faith believed that he did not have to file FBAR statements because Mr. Meier told him that he had no legal rights to the foundations' assets under Liechtenstein law.  As an initial matter, Defendants have offered no evidence to suggest that Margelus did in fact believe he had no rights in the foundations.  But further, even if they had

1   offered this evidence, under the objective standard, a reasonable person in the same or similar

2   circumstances ought to have known that he would still be required to report the foreign bank

3   accounts that held his income and supported his business and family, regardless of whether he had

4   legal rights to the foundations under Liechtenstein law.

5          Third, even if it is unclear whether Margelus objectively ought to have known about the

6   requirements and risk they were not being met, Margelus was in a position where he could have

7   very easily discovered this information.  When Mr. Ebrahimi asked him if he had foreign bank

8   accounts, given his control over the company and financial institutions, Margelus was very easily

9   able to find out why he would be asked that question.  When Margelus undisputedly reviewed his

10  tax forms prior to signing and filing, Margelus was again presented another opportunity to ask

11  questions and find out why that question would be on the form.

12         Finally, based on the undisputed size and intricacies of the Structure, the Court can infer

13  that Margelus's conduct in creating and maintaining this Structure reflected an effort to conceal or

14  mislead sources of income or other financial information.  While this conduct alone does not

15  satisfy the Government's burden, it adds important context to the undisputed facts above and

16  allows the Court to further infer willfulness.

17  *2009 Filing*

18         Margelus did not file an FBAR while he was alive.  After he died in January 2010, his

19  Estate, administered by Francis, filed its first FBAR for the 2009 reporting year.  FB 61:19–23;

20  App. 3037.  However, the Estate claimed only 85 of the estimated 147 foreign accounts existing

21  throughout the 2009 filing year, excluding an estimated 62 accounts.  App. 3037.  Given that

22  Francis filed this FBAR on behalf of the Estate, to aid in the flow of the analysis, the Court will

23  address this filing in the section below analyzing Francis's willfulness.

24             **2.       Francis**

25         Francis, as the Government states, "presents a different set of circumstances."  MSJ 21.

26  *2004–2008*

27         The Court finds that there are many genuine disputes of material facts regarding whether

United States District Court
Northern District of California

1    Francis should have known about the FBAR filing requirements and the grave risk that they were

2    not being met, or was able to find out very easily, for the filing years 2004–2008.  This issue will

3    ultimately rely on a credibility determination, which is inappropriate for summary judgment.

4           First, there is conflicting evidence regarding whether Francis had knowledge, or should

5    have had any knowledge, of most[9] of the foreign bank accounts in the Structure during the

6    reporting years 2004–2008.  The Government argues that she ought to have had knowledge of the

7    Structure because of her role as Vice President of Marketing and Sales at GWUSA, but Francis's

8    testimony contradicts this argument.  Francis testified that her title did not give her the access to

9    information that the Government suggests.  MT 48:6–12; 96:14–19; 143:3–5; 214:10–215:5.

10   While Francis managed sales and marketing, Francis testified that she was not actually given any

11   access to the company's finances and was prohibited from even asking questions due to

12   Margelus's abuse.  *Id.*; *see also* FB 88:15–20; 133:17–134:9.  Even in his illness, Francis testified

13   that Margelus maintained control over the company.  MT 16:5–6, 214:5–12.  While Francis was

14   included on invoices referencing some of the foreign entities in the Structure, she testified that she

15   believed that the foreign entities played legitimate roles in GWUSA's business.  MT 48:6–15,

16   102:11–15, 102:25–103:8, 131:9–25, 133:7–17, 186:10–20, 198:12–19.  Under the objective

17   analysis, a reasonable jury could find that a person in the same or similar circumstances—working

18   as Vice President of Sales and Marketing, carrying out international invoicing and sales

19   negotiations, and facing the type of abuse Francis describes that prevented her from involving

20   herself in the company's financials or asking questions—should not necessarily have known about

21   the Structure.  To conclude either way, the jury would have to determine the credibility of

22   Francis's testimony.

23          Second, even if Francis knew or ought to have known about the accounts,[10] there is

24

25   [9] Notably, the Government does not specify which accounts they allege Francis knew about or
     should have known about.  Instead, the Government argues that Francis should have had
26   knowledge of the entire Structure because of her role as Vice President of Marketing and Sales
     without specifically tying her role to each account at issue.
27   [10] Further, even if Francis knew or should have known about the Structure, the Government will
     still need to prove that she had a financial interest, signature authority, or other authority over the
28   Case No.: 5:19-cv-03246-EJD

     ORDER GRANTING IN PART AND DEN. IN PART MOT. FOR SUMM. J.

United States District Court
Northern District of California

conflicting evidence regarding whether she ought to have known about the FBAR requirements and the grave risk that they were not being met.  Mr. Ebrahimi testified that he asked Margelus and Francis whether they had foreign accounts each year, but Francis testified that she was never asked and was never involved in the preparation of the tax forms.  BG 28:22–30:19, 74:8–21, 89:21–90:17; FB 141:18–142:9.  The Government also presented an email Mr. Ebrahimi sent to both Margelus and Francis asking whether they had foreign bank accounts, but Margelus replied without including Francis.  BG 36:7–16; App. 2879.  There is no evidence that Francis saw the original email since she did not respond to it and was not included in the correspondences following.  BG 36:7–16; App. 2879.  It is possible that Francis did not read the email.  While her signatures on the tax forms indicating that she did not have any foreign bank accounts could be considered evidence that Francis had constructive knowledge of the FBAR requirements and the risk they were not met, this alone is not enough to show willfulness.

Third, regardless of whether Francis clearly ought to have known that there was a grave risk that the filing requirements were not being met, there are genuine disputes of material fact regarding whether she had the opportunity to find out for certain very easily.  Given Margelus's alleged abuse and control over the family and business finances, it is possible that Francis was not able to easily ask questions about the Structure without facing further abuse.  And given her testimony regarding her more limited role in the company, it is possible that she did not have access to the spaces, conversations, and documents that would have given her the opportunity to discover the foreign accounts, the obligation to report, and the risk that they were not reporting.

Finally, unlike Margelus, the Court cannot infer willfulness based on conduct to conceal or mislead sources of income.  While Francis operated sales and marketing, including managing invoices to GW Singapore and GW Japan which sometimes referenced other entities in the Structure including Aljohn and IKA, Francis testified that she believed IKA, GW Singapore, and GW Japan played a legitimate role in GWUSA's sales process, and she did not know about Aljohn

---

remaining accounts to prove that her failure to file FBARs as to those accounts was willful.

1   until after Margelus's death.  MT 48:6–15, 102:11–15, 102:25–103:8, 131:9–25, 133:7–17,

2   186:10–20, 198:12–19.

3        Given the breadth of disputed material facts, the Court finds summary judgment as to

4   Francis's willfulness during the reporting years 2004–2008 inappropriate at this time.

5        *2009*

6        However, the facts differ as to the FBAR for the 2009 reporting year. [11]  After Margelus

7   died in January 2010, Francis took over operations as President of GWUSA.  MT 16:2–6.  On

8   March 10, 2010, Francis received multiple letters addressed to Margelus from the IRS asking for

9   information about several offshore entities.  App. 2888–89, 2891–907.  After receiving the letters,

10  Francis retained counsel to investigate the Structure.  FB 60:5–8, 61:14–16.  Francis then had her

11  2009 joint tax return prepared by H&R Block.  FB 139:12–17.  Despite hiring counsel and

12  investigating the accounts in the Structure, and despite withdrawing 10,000 EUR from Raiffeisen

13  x50.17 in December 2009, Francis still answered no when asked whether she had "an interest in or

14  a signature or other authority over a financial account in a foreign country."  App. 2577, 3821–24.

15       Given these new facts after Margelus's death, the Court finds that, specifically for the 2009

16  reporting year, Francis ought to have known that there was a grave risk that FBARs were not

17  being filed, and she was able to find out for certain very easily.

18       First, there is no longer conflicting evidence regarding whether Francis ought to have

19  known about the Structure.  At this point in time, Francis had received correspondences from the

20  IRS regarding some of the accounts and hired legal representation to investigate the Structure.

21  Just months prior to filing, Francis personally withdrew 10,000 EUR from one of the foreign

22  accounts in the Structure.  App. 3821–2.  Francis had enough information about the Structure to

23  discover the accounts in which she had financial interest, signature authority, or other authority.

24       Second, there is no longer conflicting evidence regarding whether Francis ought to have

25  known about the FBAR requirements and the grave risk that they were not being met.  Unlike the

26

27  ───────────────
    [11] The Court's willfulness finding only applies to the accounts where the Court found financial
    interest, signature authority, or other authority during the 2009 reporting year.

28  Case No.: 5:19-cv-03246-EJD
    ORDER GRANTING IN PART AND DEN. IN PART MOT. FOR SUMM. J.
    24

United States District Court
Northern District of California

2004–2008 reporting years, Francis does not contest that she worked with H&R Block to file her 2009 returns. While Francis contests that she was asked about foreign accounts by H&R Block, Francis also signed her tax form indicating that she had no foreign bank accounts, and unlike the prior years, Margelus was no longer alive to pressure Francis to sign documents without reviewing them. A reasonable person in the same or similar circumstances ought to have noticed this question and made the connection that she was required to report her foreign bank accounts on her taxes.

Third, there are no longer genuine disputes of material fact regarding whether Francis had the opportunity to easily discover the Structure and FBAR requirements. Francis was now the President of GWUSA. She had access to an attorney, an accountant, and all GWUSA's records. Francis was no longer under the control of Margelus and no longer pressured to not ask questions about the company's finances. When Francis was asked about whether she had foreign accounts for the 2009 reporting year, unlike the years prior, Francis had the opportunity to find out about the FBAR requirement and the likelihood that it was not being met very easily.

Therefore, the Court finds there are no genuine disputes of material facts regarding whether Francis's failure to file an FBAR for the 2009 reporting year—after having all the resources and information available to her to investigate the accounts and after personally withdrawing money from the foreign Raiffesen account mere months prior—was willful.

### 2009 (On Behalf of the Estate)

Similarly, the facts differ as to the FBAR Francis filed on behalf of the Estate in 2010 for the 2009 reporting year, which reported only 85 foreign bank accounts, omitting approximately 62 accounts. App. 3037. The Government argues that the failure to report the remaining 62 accounts was also willful. During oral arguments, the Government classified the attempt at compliance as halfhearted and argued that this filing was a mere extension of the previous pattern of willfulness. ECF No. 43.

Defendants argue that willfulness here is a question of fact. The Estate relied on counsel in determining there were only 85 accounts. Opp'n 26. During oral arguments, Defendants argued

United States District Court
Northern District of California

that the number of accounts may be wrong, but it was based on the information Mr. Meier provided to Francis, and there is a factual question as to whether relying on Mr. Meier was reckless or willful, or merely negligent.  ECF No. 43.  Further, Defendants argue that omitting the 62 accounts could have been an innocent mistake—while there were 147 accounts throughout 2009, Defendants suggest that Francis reported only 85 accounts because there were only 85 accounts at the end of the year.  *Id.* at 1–2, 13, 24.

The Court agrees that the 2009 filing year does present a different set of circumstances than the 2004–2008 filing years.  However, the Court still finds that the failure to report an estimated 62 accounts was willful.  As previously stated, Francis was now in a position of great power at GWUSA and had access to attorneys, accountants, and the company's financials.  Upon discovering the Structure after Margelus's death, particularly after discovering the great breadth of the Structure, a reasonable person in the same or similar circumstances should have made every effort to fully investigate the foreign accounts.  Instead, Francis, on behalf of the Estate, relied completely on Mr. Meier to investigate, and she once again signed the forms without reviewing the information.  While Defendants suggest that Francis believed she only had to list the accounts at the end of the year rather than throughout the year, Defendants offer no evidence to support this suggestion.  Further, the instructions clearly require reporting any foreign account that exceeded $10,000 "at any time during the calendar year."  App. 3040.  Considering this clear instruction and the lack of evidence supporting the suggestion that Francis believed she only had to report the accounts existing at the end of 2009, Defendants' argument does not move the needle enough to create a genuine dispute of material fact.

Ultimately, when filing the 2009 report on behalf of the Estate, Francis was no longer unaware of the Structure, no longer under the control of an abusive spouse, no longer pressured to sign documents without reading them, and no longer prevented from reviewing family or business financial information.  Considering this significant change in circumstances, Francis, on behalf of the Estate, ought to have known about the missing 62 accounts and the grave danger that FBARs were not filed for them, and Francis was clearly in a position of power with access to the resources

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

1   necessary to have easily discovered the accounts and requirement that they all be reported.

2       Therefore, the Court finds no genuine dispute of material fact regarding whether the Estate

3   willfully failed to report the remaining 62 accounts for the 2009 reporting year.

4                                          * * *

5       The Court finds that there are no genuine disputes of material fact regarding whether

6   Margelus willfully failed to file FBARs for the Structure from 2004–2008, or whether his Estate

7   willfully failed to report the 62 accounts omitted in its 2009 return.  The Court also finds that there

8   are no genuine disputes of material fact regarding whether Francis willfully failed to file an FBAR

9   for the 2009 reporting year for those accounts in which she had financial interest or authority.

10  However, there remain genuine disputes of material fact regarding whether Francis's failure to file

11  FBARs during the 2004–2008 reporting year was willful.

12  **IV.    CONCLUSION**

13      For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the

14  Government's motion for partial summary judgment.

15      The Court finds genuine disputes of material facts exist regarding whether Francis had a

16  financial interest, signature authority, or other authority over the foreign accounts in the Structure

17  other than UBS accounts x7.405, x405, x280.0, x280.1, x280.3, x280.4, and x280.5 (from 2004

18  until the 2007 transfer), Raiffeisen x50.17, GKB x0.100, and LGT x6.023, x6.030, and x7216; and

19  whether Francis's failure to file FBARs for the reporting years 2004–2008 was willful.  Therefore,

20  the Court **DENIES** the Government's motion for summary judgment as to those accounts during

21  the years indicated and **GRANTS** the Government's motion as to the remaining accounts.

22      **IT IS SO ORDERED.**

23  Dated: November 27, 2023

24

25

26  EDWARD J. DAVILA
    United States District Judge

27

28  Case No.: 5:19-cv-03246-EJD
    ORDER GRANTING IN PART AND DEN. IN PART MOT. FOR SUMM. J.